*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF TEXAS*
*HOUSTON DIVISION*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL CAUSE 4:14-CR-204** |
| | § | **JUDGE KEITH ELLISON** |
| **GREGORIUS BROWN** | § | |

## MOTION TO SUPPRESS

*TO THE HONORABLE KEITH ELLISON*:

Greg Brown asks the court to suppress out-of-court and in-court identification as evidence against him at trial, and shows the following in support of this request:

1.     Brown is charged with conspiracy and health care fraud.  His trial is scheduled to begin on August 19.

2.     Brown asks the court to suppress out-of-court and in-court identification as evidence against him at trial.  The identifications are the result of law enforcement officers' use of needlessly suggestive identification procedures. The resulting identifications of Brown violate his due process rights and are unreliable.  No testimony about these identifications should not be permitted at trial. There is no factual dispute about the manner in which the identifications were made.  Brown asks that the Court hold an evidentiary hearing on this motion only if relief cannot be granted based upon the pleadings.

## I.     Witness Identifications

3.     The government provided the defense with reports of various witness interviews.  The report of witness Nehemiah Byrd's interview states that Byrd was apparently shown some photographs of individuals suspected of involvement in the case.  Byrd apparently identified one photograph as Brown.  The report also states that Byrd claimed Brown would check patients' vital signs and told

Byrd when to meet "Robert" in the clinic restroom to get paid for bringing patients to the clinic. Byrd is the only witness that directly alleges Brown engaged in any illegal activity.

4.      Audrey Larkin was also interviewed by the police.  She was apparently shown a photo of Brown.  Larkin stated that he looked familiar and could possibly have been a doctor at the clinic.

5.      Tham Ngoc Tran, also known as Cindy Tran, was also shown photos by the officers.  She identified a photo of Brown and said he worked as a physician assistant at the clinic.

6.      Egor Ostrikov similarly was shown a photograph of Brown and identified him as working at the clinic.

7.      All of these witness identifications were conducted in a manner that violated Brown's Due Process rights.  None of the identifications comport with the widely accepted procedures for conducting witness identifications of suspects.

II.      **Argument**

   A.      **DOJ Best Practices For Conducting Identifications By Witnesses**

8.      Incorrect identifications by witnesses have become a significant problem in the criminal justice arena.  Many of the defendants exonerated by DNA or other evidence were convicted on faulty witness identifications.

9.      The identification "procedure" used in this case has been widely discredited.  Indeed, the Department of Justice recently published papers listing the best practices for identifications by a witness. *See* http://cops.usdoj.gov/html/dispatch/12-2014/eyewitness_ID_best_practices.asp. In this paper, the author - a police chief - cites to the five "best practices" identified in an exhaustive scientific study conducted by the National Academy of Sciences[1] (NAS):

  The NAS stressed the importance of providing both recruit and refresher training to

---

  [1]The NAS study is attached to this motion.

law enforcement on vision, memory, and the practices the police can employ to minimize contamination and enhance the accuracy of the identifications they obtain.

Live and photo lineups should be conducted by a blind administrator. In the case of double-blind lineups, neither the administrator nor the witness knows the identity of the suspect. In instances where a smaller police agency lacks personnel to conduct a double-blind lineup, the NAS recommends a "blinded" procedure where the officer knows the identity of the suspect but performs what is known as a "folder shuffle" to prevent him or her from seeing which photo the eyewitness is viewing. With both methods, because the administrator is effectively "blinded," he or she cannot unintentionally convey any gestures or clues which might prompt an eyewitness to make a selection.

Law enforcement should develop standardized witness instructions informing the eyewitness that the perpetrator may or may not be in the lineup and that the investigation will continue regardless of whether a selection is made. This will reduce the chance of the eyewitness feeling pressure to make a selection out of fear that the investigation will not otherwise continue.

After a selection is made, officers should immediately take down a verbatim confidence statement in which the eyewitness articulates how certain he or she is. This is important because an eyewitness's confidence can become inflated between the time of an identification and a possible trial. Having the witness describe his or her level of confidence at the time an identification is made will provide juries with a useful tool for judging the true level of confidence articulated by the eyewitness at the time of an identification.

Identification procedures should be video-recorded from start to finish to preserve a permanent record of the procedure.

10.   The NAS study states:

A range of best practices has been validated by scientific methods and research and represents a starting place for efforts to improve eyewitness identification procedures. A number of law enforcement agencies have, in fact, adopted research-based best practices. This report makes actionable recommendations on, for example, the importance of adopting "blinded" eyewitness identification procedures. It further recommends that standardized and easily understood instructions be provided to eyewitnesses and calls for the careful documentation of eyewitness' confidence statements. Such improvements may be broadly implemented by law enforcement now.

11.   Recognizing the dangers of improperly conducted identification efforts, the Texas Legislature in 2011 approved HB 215 which required Texas law enforcement agencies to adopt a "detailed

written policy" governing eyewitness procedures by Sept. 1, 2012.  The Legislature also ordered the Law Enforcement Management Institute of Texas (LEMIT) at Sam Houston State University to create a model policy to guide departments in developing their policies, though law enforcement agencies were left free to deviate from the model policy if they choose.  With a few notable exceptions, the large majority of agencies adopted the model policy.  *See* http://www.chron.com/news/houston-texas/article/Police-group-sets-training-for-eyewitness-ID-3507677.php.  In fact, numerous states and municipalities have adopted policies to eliminate the type of "identification" made in Brown's case.

### B.      The Identifications in Brown's Case

12.     *None* of the best practices for constitutional and accurate identifications were employed in Brown's case: there is no evidence the officers who conducted the identification procedure had been trained to do so; the identification was conducted by officers involved in the investigation instead of using officers unrelated to the case, no standardized instructions were given to the witness; the witness was not asked immediately after his or her identification about his or her  level of confidence in the decision; and no recording of the identification procedure was made.  Instead, single photos of suspects were shown without giving any instructions to the witness, and the officers involved in the case presented the photos to the witnesses.

### C.      Due Process Requirements

13.     The Due Process Clause of the Fifth Amendment protects accused individuals from the use against them of evidence derived from unreliable identifications that resulted from impermissibly suggestive procedures. *United States v. Rogers*, 126 F.3d 655, 658 (5th Cir. 1997); *United States v. Sanchez*, 988 F.2d 1384, 1390 (5th Cir. 1993). The admissibility of identification evidence is governed by a two-step test under which the Court asks first, whether the identification procedure

was impermissibly suggestive and, second, whether the procedure posed a "very substantial likelihood of irreparable misidentification." *Sanchez*, 988 F.2d at 1389 (*quoting Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247). If the answer to both questions is yes, the identification is not admissible. "The gravamen of the determination is fairness and reliability." *Sanchez*, 988 F.2d at 1389.

14.     Courts determine the likelihood of misidentification by considering five "Biggers" factors: (1) The witness's opportunity to view the accused at the time of the crime; (2) the witness's degree of attention to the subject; (3) the accuracy of the witness's prior description; (4) the degree of certainty exhibited by the witness at the time of the viewing; and (5) the amount of time which elapsed between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382 (1972). "Against these five factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977). Applying these legal principles to the identification procedure used in the instant case requires this Court to suppress both the evidence of the pre-trial identifications and any in-court identifications.

**D.     <u>The Identifications of Brown were Impermissibly and Needlessly Suggestive</u>**

15.     In this case, the government merely showed the witnessses individual photos, all of individuals involved in the investigation.  An identification procedure is suggestive when it "emphasize[s] the focus upon a single individual" thereby increasing the likelihood of misidentification.  *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.").  Additionally, "when, as here, the defendant is of a different race than the witness, concern about suggestiveness is heightened." *Roger,* 126 F.3d at 658. *See also* Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell

L.Rev. 934 (1984).  The procedure was highly suggestive, and there is simply no reason that a more reliable procedure, such as a photospread,[2] could not have been used.

16.     Moreover, "the chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* In Brown's case, the officers apparently showed only photos of individuals suspected of involvement in the alleged offenses.

**E.      The Government's Procedure Posed a Very Substantial Likelihood of Irreparable Misidentification**

17.     The totality of the circumstances indicates that there is a very substantial likelihood of misidentification by at least some of the witnesses in this case, considering the five factors set forth in *Neil v. Biggers*.

18.     None of the reports state how much time any witness spent with Brown, or how close in distance he was to each witness.  It appears that some of the witnesses' opportunity to view the accused at the time of the crime - the first *Biggers* factor - was brief.  The degree of attention to the subject - the second factor - for some was also low.

19.      The third *Biggers* factor is the accuracy of the witness's prior description.  There is no indication of any pre-debriefing description of Brown by any witness.  This factor "weighs neither in favor of, nor against, reliability." *See Rogers,* 126 F.3d at 659.

20.     The government's reports do not contain any information regarding the fourth factor - the

---

[2]The government often uses a photospread, or "6 pack" of photos, which requires the witness to chose an individual from six photos.  The Fifth Circuit has upheld that a district court's determination that a photospread was not unduly suggestive when "the photographs were placed in the photospread at random, were all taken from similar driver's license records, were viewed at the same time on one piece of paper, and appeared to be of very similar Hispanic males." *United States v. Saenz*, No. 07-40344, 5th Cir. (2008).  Inexplicably, the investigation here did not even use a photospread.

degree of certainty exhibited by the witness at the time of the viewing.  It should be noted, however, that the Fifth Circuit stated in *Rogers*, "Even the best intentioned among us cannot be sure that our recollection is not influenced by the fact that we are looking at a person we know the Government has charged with a crime."  126 F.3d at 659.

21.     The fifth *Biggers* factor is the amount of time which elapsed between the crime and the identification.  At a minimum, several months elapsed between the witnesses' alleged interactions with Brown and the meetings in which the photos were shown.  *See Rogers*, 126 F.3d at 659 (10 months between the crime and the trial identification "raises concerns about the accuracy of the memory.").

### III.     Conclusion and Request for Evidentiary Hearing

22.     The government failured to follow the scientifically valid best practices for conducting witness identifications.  The government did not even use a photo array that contained photos of other individuals as well as Brown.  Instead, the government showed a single photo of Brown and asked the witness if it was Brown.  This identification procedure was impermissibly suggestive and poses a very substantial likelihood of irreparable misidentification.  There is no excuse for asking witnesses to identify individuals by using the discredited "procedure" employed in this case.  The investigators were not under any time pressures and simply chose not to use a more reliable and constitutional procedure.  Due process precludes allowing a jury to hear this highly questionable evidence.

Respectfully submitted,

/s/ David Adler

_____

David Adler

State Bar of Texas 00923150
Southern District of Texas 17942
6750 West Loop South
Suite 120
Bellaire (Houston), Texas 77401
(713) 666-7576
(713) 665-7070 (Fax)

Attorney for Defendant,
Gregorius Brown

CERTIFICATE OF SERVICE

This motion was served upon the Assistant United States Attorney via the court's ECF filing system on July 27, 2015.

/s/ David Adler

_____

David Adler

CERTIFICATE OF CONFERENCE

The Assistant United States Attorney is presumably opposed to this motion.

/s/ David Adler

_____

David Adler

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL CAUSE 4:14-CR-204** |
| | § | **JUDGE KEITH ELLISON** |
| **GREGORIUS BROWN** | § | |

## ORDER ON MOTION TO  SUPPRESS

Brown's motion to suppress is:

Granted,

Any identification of Brown that resulted from showing a single photo to the witness will not be admitted at trial.

Denied.

(or)

An evidentiary hearing will be held on_____ _____, 2015, at _____ am pm.

Signed on _____, 2015.

_____
Keith Ellison
United States  District Judge